Case number 23-6129, Alpine Securities Corporation, Appellant, Scottsdale Capital Advisors Corporation v. Financial Industry Regulatory Authority, United States of America. Mr. Barnes for the appellant, Mr. Taurani for the appellee FINRA, Mr. Busa for the intervener appellee, United States. Good morning, counsel. Mr. Barnes, please proceed when you're ready. Good morning, your honors, and may it please the court. This appeal presents an as-applied challenge to a FINRA enforcement proceeding. And while the legal issues before the court are important, the remedy that Alpine seeks is narrow. The ability to continue to run its business while it pursues its claims, free from summary and position of the corporate death penalty by an unaccountable enforcer of federal law. Under HALAC and the Supreme Court's other state action precedents, FINRA is the government when it enforces federal law and exercises executive power. And those who enforce federal law must comply with the highest federal law, including the Constitution's structural provisions. As applied, you're talking to the expedited proceedings that they have here. Is that what you mean? That's correct, your honor. You're not challenging the substantive FINRA rule content, their ability to have the rules against improper fees and the other substantive rules that ceiling client funds and things like that that are enforced against you. We have a broader challenge in the complaint to FINRA's rulemaking authority as well as its enforcement authority, but that's not part of what we ask for preliminary injunctions. It's just for the expedited proceeding. That's correct, your honor. And that's a critical distinction. And the reason it's so important is because the rules that FINRA makes, they don't go into effect. They don't begin to have legal force in effect until the SEC reviews and approves them. But here in the context of this expedited proceeding, there's the potential for Alpine to be expelled from the industry. The SEC doesn't actually have to approve them. It has to put them out for notice. And if it doesn't do it within a certain amount of days, they're deemed approved. I believe that's correct, your honor. I think that's right. But nevertheless, the point remains that the axe does not swing on the part of FINRA until there's an opportunity for the SEC to look at the rule that's being enacted. Now, you know, admittedly, we have a challenge to that process as well. We think that that also is problematic under the Constitution's structural provisions. But here, all we're asking for is a preliminary injunction that would prevent an enforcement action that has the potential to expel Alpine from the industry before the commission has an opportunity to review it. You're entitled to plenary SEC review, not just a stay motion, before any sanction could go to effect. Would that solve your problem? It would go a long way towards solving the problem, your honor. I don't think it would fully solve the problem. And the reason is I would analogize that situation to the Supreme Court's decision in Lucia. And there was de novo review of ALJ SEC decisions by the commission. But nevertheless, you know, notwithstanding that de novo review, the Supreme Court said these ALJs are exercising significant executive authority, as the people in FriTag were, you know, earlier. And because they're exercising significant executive authority and because they occupy continuing positions, they have to be appointed in conformity with the Appointments Clause. And so even with the de novo review by the SEC before… What were the sanctions that the Lucia ALJs were enforcing or imposing? In Lucia, your honor? You know, I'd have to go back and look at the case. I think it was the ALJs in Lucia have the same scope of authority with respect to the people who are the targets of SEC enforcement action, as FINRA hearing officers do. Could they have kicked you out of a private organization, Lucia, or could they have simply, you know, said your license is invalid or… Well, here the two things are one and the same. I'm really out there. It's different in my mind. They may end up in the same place. I understand, like, the end of the day, it's just as bad. But I'm just asking if they could say you no longer get to be a member of whichever self-regulatory organization the particular person has. I think if you were expelled from the industry by the commission, by the ALJs, you necessarily would lose your membership. If I'm asking the predicate question, could they say you can no longer be a member of self-regulatory organization X? I think the answer to that is yes. I'd have to go back and look at the Exchange Act to confirm. I'm not certain of the answer to that. Let me make a point about why we think those two things are one and the same here. And it goes back to the history of the development of these SROs. And from our point of view, the relevant history in this case starts in 1983. And the reason the year 1983 is so important is it's not until 1983 that Congress passes a law that says that in order to be a member of this industry, to practice in this trade, it's necessary to join FINRA's predecessor, the NASD. And until 1983, there were a significant number of broker-dealers that were not members of any self-regulatory organization. It was possible to run a broker-dealer without joining any of these organizations. But Congress makes that mandatory in 1983. You have to join a self-regulatory organization. It happens to be that's the one. But I assume new ones could be created. And if they comply with the statutory requirements, then you could have a new self-regulatory organization as well. In theory, that's true, Your Honor. But the SEC is so entwined with this arrangement between the SROs and specifically FINRA in itself that in order to get approval for a new National Securities Association, the SEC would have to sign off on that. And we see with the merger of the NASD and the New York Stock Exchange's enforcement arm that the SEC was deeply involved in that merger and conditioned the merger on the further erosion of the ability of members of FINRA to influence what FINRA does and specifically in the context of enforcement proceedings. And so while it's in theory true that if you read the Exchange Act, some new SRO could be recognized that would compete with FINRA as a matter of practice, that's not something that obviously we have and it's not something that the Commission has permitted. And so I think that makes this a very different situation. But Judge Millett, I think your question does go to an important point, which is that there's a really critical difference between FINRA on the one hand and some of these exchanges on the other that are other SROs. And the reason that there is that difference is because it's not necessary to be a member of an exchange to practice in the securities industry. And a number of the exchanges file an amicus brief in this case, siding with my friends on the other side on a lot of the issues. But if you look at their brief, they acknowledge that the exchanges are differently situated in this way from FINRA because it's not a legal requirement to be a member of any exchange in order to be broker dealer or practice in the securities industry. And so that's just a really significant difference and one that's particularly relevant in the context of enforcement proceedings. Can I ask, you'll resist the premise of this, but just indulge me. So suppose that I'm persuaded by the Oklahoma decision that it applies here and there's not a private non-delegation problem. Then what is the extra work that's being done by the appointments clause slash removal challenge that you're making? Because the way I think the other side sees the world is that that's the check. As long as there's not a private non-delegation problem, then everything's okay and you don't worry about the appointments clause. But you obviously don't have to agree with that. So I'm just asking conceptually, why aren't they right? What's the extra that's being done by the appointments clause part of your challenge that we should take cognizance of? So Chief Judge Sreenivasan, I think we're at something of a doctrinal fork in the road here. And there are two ways of conceptualizing the problem. One is to say there's independent work for the appointments clause to do because the appointments clause requires a degree of accountability to the president that isn't mandated by the private non-delegation doctrine. And the other side says if you take that view, then there's no work to do for the private non-delegation doctrine. But that's not right at all. One can imagine someone who doesn't have a position. They've been given some measure of government authority, but their position either isn't continuing or it's not an important enough position for them to qualify as an officer of the United States under the appointments clause. Nevertheless, the private non-delegation doctrine comes in to ensure that that person has to serve in a capacity of subordinate to somebody in the government. So to just use a concrete example, imagine a prison guard at a private prison that the federal government has set up. That prison guard, if they're totally unsupervised and they're not subject to any oversight at all in terms of how they operate in their position coming ultimately from the federal government, that would be a private non-delegation problem. It probably wouldn't be an appointments clause problem because that person would not be an officer of the United States. And so there is independent work for these two doctrines to do. But I say we're at a doctrinal fork in the road because another way to conceive of the problem here would be to basically import the degree of accountability that the appointments clause requires and the president's constitutional removal power requires and import that into the private non-delegation doctrine. The key point, I think, the critical point for this case is the insight that Judge Walker had in his concurrence at the motions panel stage, which is that it just can't be that the way these different doctrines line up that end up with a situation where the Constitution requires less accountability when executive power is given to somebody outside the government than the degree of accountability that the Constitution requires when we're dealing with somebody who's in the government. That just doesn't make any sense. The whole point— Isn't the accountability all for a private non-delegation in the responsibilities of the federal agency or entity, executive branch entity, that is in charge of supervising or superintending the private delegee? I think that's a perfectly legitimate way to think about the problem here, Judge Millett, but the thing I'd say about it is if we conceive of the problem that way, the degree of accountability that's necessary is the degree of accountability that the appointments clause and the president's removal power require. How is the accountability of the SEC for everything that FINRA does that is part of its wheelhouse? FINRA has other things. These organizations have been around a long time, but to the extent FINRA is doing things that are within the superintending role of the SEC, how has the accountability been diminished? The answer to that question, Judge Millett, is the same answer that the Supreme Court gave Lucia and that the Supreme Court gave the Free Enterprise Fund. There wasn't sufficient accountability. So the PCAOB, it's structured in exactly—apart from it being a government-chartered organization— Government-appointed board, which we don't have here. And that's the thrust of our objection, is that we don't have a government-appointed board, even though FINRA is exercising powers that are directly analogous to the powers that the PCAOB exercise and that the ALJs and Lucia exercise. They don't have subpoena power. They don't have subpoena power, Your Honor, that's true, but they don't— There's nothing they can do if you violate—if they do an enforcement proceeding, they can't take that to court to enforce it. Well, they can do whatever. The ALJ ones are either self-enforcing or, through court review, eventually enforcing. No, what they can do is deal with your membership in their private organization. What they can do is close your business. No, what they can do is deal with your membership. The consequence of that, thanks to congressional statute—maybe it's going to be very hard to say in this case—but what they say is, you are not part of our organization anymore. That's what they're doing here. Their attempt is, as I understand it, to expel Alpine from their organization. So, Judge Millett, I think it's critical to ask, what is the source of FINRA's authority to expel someone from this industry? And if we look at this court's decision in NASD versus SEC, Judge Edwards, writing for this court, explains in detail that the source of the NASD's authority, the predecessor to FINRA, is the Exchange Act, a delegated authority that comes from the Securities and Exchange Commission. If we go back to the beginning, when these first self-buttonwood—who sit under the buttonwood tree, they created private self-regulatory organizations. Did those organizations have the ability to expel members? Yes, they did. Did they have the ability to expel members for charging unfair commissions? It is one of their old rules, so yes. It was one of their rules, so if they violated it, they could have kicked you out. And so here, an Alpine charge, among other things, charged commissions that exceed what we say is allowed, and we want to kick them out. They had that authority to kick you out, to kick members out, regardless. If we go back to the buttonwood tree, Your Honor, the power to expel a member then came out of the contractual relationship between the members and the organization. That's not what this court said is the source of FINRA's power in an ASD versus SEC. The source of FINRA's power is a federal statute, and it's a delegated authority. I think what you're saying is sort of—I think what you're saying there is that—I don't think they're saying if Congress repealed the SEC tomorrow, FINRA could still proceed with precisely this action. Could it not? They're saying we don't want you as a member. I think that's true. If Congress repealed the statutes that mandate membership in FINRA as a condition of— Membership in a self-regulatory organization, correct. And I get that FINRA's your only option. They've got a corner on the market for you. But I'm just focusing on what their action here is doing, and they are applying FINRA rules that existed long before, versus this expedited proceeding. That's all you told us we're looking at. They're enforcing FINRA rules that long preexist, these congressional statutes you're talking about, and they're doing it to say, get out of our organization. And that's it. And the consequence, of course, is if you're out, then thanks to Congress, you can't practice in the industry. Your business will not be able to function, at least in this particular industry or this aspect of your business. I don't know what Alpine does anything else. You're the ones who said it's a death penalty. So I think that's what we were talking about in an SD decision. But FINRA, or FINRA and its antecedents, have always had the ability to kick members out for charging unfair, what they deemed under their own rules, unfair or improper commission. And that would exist even, again, like if Congress repealed everything tomorrow, they would still have that ability. You would still be kicked out. The consequences might not be as dire for your business. Or maybe they would, if you have a distinction of a self-regulatory organization, just assuming merits there. I'm not opining on that. But if you have for company X, the self-regulatory organization says we're kicking you out because you've done all these violations of these rules, business might be in a little trouble. Anyhow, but they're not doing anything here they haven't been able to do since very, very early in the years of Republic. In this particular case, you said it's an as-applied challenge. That's correct. It's an as-applied challenge. And respectfully, Your Honor, we disagree. And the several courts of appeals have said these FINRA rules and FINRA enforcement proceedings have the force and effect of federal law. If Alpine gets sanctioned by the SEC, Your Honor is correct. FINRA may not be able to go to court and get collect on whatever monetary penalty is imposed, but the SEC can. And what that shows is that this is a federal... The SEC will be accountable for that action. But the SEC needs to also be accountable for the expulsion of Alpine. And that's why I suspect if this were to go forward, Alpine would seek review by the SEC. And then nothing would happen until the SEC owns the action, at which point the SEC is accountable for it and get court review even, which could add more accountability to the SEC. And respectfully, Your Honor, that's not quite correct because as soon as the hearing officer in this expedited proceeding says Alpine is out, then automatically Alpine is out of the industry. It has to close its business at that moment. And it's true that we could go seek a stay from the SEC. The SEC could ultimately overturn that decision. But it's just like a federal district judge entering final judgment in a case and then a litigant who lost taking an appeal to the court. The SEC could stay, right? So it actually wouldn't irrevocably take effect immediately? So the SEC can issue a stay, but the stay doesn't take effect automatically upon the application for an appeal. I point the court to 15 U.S.C. 78 SD2, which says that the SEC isn't permitted to automatically stay expulsion decisions when a member is expelled from FINRA. And this actually happened, as I'm sure the court is aware, to Alpine, where it was previously expelled by FINRA in an earlier enforcement action. And it took several days for the SEC to issue a stay, and ultimately it overturned FINRA's decision. But during that interim time, Alpine had to close, and it lost customers as a result of that. This is a huge deal for a broker-dealer to have to call up their customers and tell them, like, sorry, you can't trade in your securities for the next few days. We're trying to get the commission to let us open our business again. And that is an exercise of executive power. It's executive power, and it's got to be… Well, you're an excellent lawyer, and I've got to believe that whenever one of these proceedings start, obviously you're hoping to prevail. But as a backup, you've already got your stay papers written and can file them instantaneously with the SEC. And I assume they have electronic filing, and they have the ability to even do what we would call administrative stays. They may call them temporary stays. I can't remember their particular terminology. While they think about the stay motion. Is that all correct? I mean, they actually ask for the actual draft of the papers. I'm not opposed to anything. But, you know, lawyers, when an expedited proceeding like this is coming and it's serious for a company, my assumption is that they have complete control over the timing of when they will seek a stay from the SEC. You can't control when the SEC will act, for sure. You're certainly right, Your Honor, that a lawyer would have complete control over when they seek the stay. But again, 78SD2, the SEC is not even permitted to have a rule that would say as soon as somebody files their stay application, you get an automatic administrative stay of the sort that this court would enter. Instead, it's… That's a question about the prior situation. My recollection is it took like a day for the stay motion to be filed with SEC. And you said a few days. So did it take two days for the SEC to act on? I'm not certain of the exact number of days, Your Honor. I do know that there was a period when Alpine was closed between when the stay application was filed and when the commission actually entered. Yeah, I'm just wondering what hours or days. And Alpine itself took a day. And it might be understandable. I don't know if things were evening and morning or how it happened. But if I recall, Alpine took a day before it filed. And I'm just trying to figure out how long. Do you happen to know in your experience how quickly they act or not on at least issuing an administrative stay or temporary stay? My understanding, Your Honor, is that the commission doesn't, as a matter of course, always enter administrative stays in situations like this. When they do, how fast? I don't really know the answer to that, Your Honor. I know Alpine's case, it was a couple of days. It was not a matter of hours. It was days between when the stay was applied for and when the commission entered the stay. And it's worth looking at the commission stay order because, you know, it reflects at least a peek at the merits of Alpine's appeal to the commission as opposed to, you know, what we would typically see from this court, for example, with an administrative stay, where it's literally just a one-sentence order that kind of holds everything in place while a motions panel can look at the situation. That's what the implications of your argument. So on the appointment clause, the appointment removal part of it, if that challenge is successful, would that mean that the individuals whom you think the appointment clause applies to, who would be inferior officers, that they're subject to impeachment? I think that's correct, Your Honor. I confess that I haven't gone back and looked at the impeachment clause to be certain of that. It covers civil officers, I think, by its text. I guess I would assume that it covers officers. That's quite a dynamic that somebody who's with what they assumed was a private company is subject to the impeachment clause. Well, and I guess, you know, one way of thinking about our claim is that fundamentally we're saying that this is not a private entity to the extent that it's exercising delegated executive power, particularly significant delegated executive power of the sort that triggers the appointment clause. But you don't think that what the appropriate way to look at it is to ask whether the entity is in fact the government under the way the LeBron analysis proceeds. You think that test is too restrictive, too narrow? We don't regard that test as the exclusive way that the appointment clause can be triggered. And, you know, I'd point the court beside in our reply brief the 2007 OLC opinion that comes down on our side on this. Obviously, the United States is taking a different position in this case. But in 2007, the Office of Legal Counsel agreed with us about this, that in unusual circumstances, people who are outside the government can be officers of the United States. And it all turns on the nature of the authority that's delegated. Can I follow up? Can they be officers of the United States? Or are you aware of a situation where someone has been found to be an officer of the United States when they are part of an organization that the government did not create? The government is not appointing the board or whatever controlling entity is. And the government, Congress, has not set up a funding slash pay system for these officers? I don't think there's a case either way on that, Your Honor. Well, there are plenty of cases where officers have been found, or entities, individuals have been found to be officers. I'm not aware of one where a court has declared someone to be an officer who is both hired by, who works for an entity that Congress did not create, who is paid by an entity that Congress did not create. And where Congress did not set up the payment or compensation scheme. I'm just wondering if they're declared officers, is there a huge anti-deficiency act problem? They're working for the federal government without pay. But without pay by the federal government? Well, I would say they are paid by the federal government and the fees that they collect from their members in the same way that... They get the dues from their members? Yeah, I think that that's the collection of federal fees in the same way. Think of the director of the CFPB or the director of the FHFA. Both of those agencies, they're funded by fees assessed on the entities that they regulate, directly or indirectly. Did Congress say that's how this, create this FINRA and say this is how you'll be funded?  Well, FINRA rules have the force of federal law, and so... Okay, go back. These self-regulatory extensions, go back to the 40s. They existed, they had funding sources. The funding sources were, I assume, membership dues, and they were imposing penalties on members and penalties on members. That hasn't changed. The thing that's changed is 1983, Congress made it mandatory to be a member of... I understand that they made it mandatory to be a member, but they did not say how these officers of the United States will be paid. And isn't that troubling? Matter of private property interest, the notion that a court would declare somebody who works for a private entity and is paid by a private entity to be a federal employee? A federal officer, no less. And yet they're working without any congressional direction as to their source of their salary. Again, Your Honor, I think that the fees FINRA collects are analogous to the fees that plenty of other federal agencies collect when they're... Congress created entities, you know, Federal Reserve Board and these other ones. Congress created them, and Congress set up, here is the scheme about how you will be funded, and that funding includes paying your officers and employees. And the same for Peekaboo or whatever you call the organization. Right? And Congress doesn't have to say everyone's drawn from the Treasury, it's like the Postal Service. They can create a financing system, but what I'm troubled by here is that I think it would be the first time, and maybe I'm wrong, that a court would be declaring someone an officer of the United States when they are hired by and employed by and paid by a private entity without any congressional provision for their income, for their pay, for their salary when acting as a federal officer, which I think would be inefficient. It may be useful here, Your Honor, to go back to the specific type of relief that we're asking for in this appeal. And I think the PEI that we requested and that we're entitled to is an injunction that prevents this expedited proceeding from going forward unless and until the people who are going to preside over the expedited proceeding have been appointed in a way that comports with the Appointments Clause and that they are accountable in a way that's consistent with the President's... You have to have likelihood of success on the merits, and so I think we have to think about your likelihood of success in doing that, and I understand the arguments you have here, very strong arguments. It's just I'm not understanding what FINRA's supposed to do. Yeah, so I think FINRA... Right. You know, I think they could, given the nature and extent... I'm not certain about that, Your Honor. I guess what I'd say is if the court agrees with us about ultimately the merits of our claim, then the SEC and FINRA are going to have some choices about how they deal with the fallout of that, and one of the approaches... I'm not sure the SEC would have a choice either. Congress is quite clear that it views FINRA and 50 other of these type entities to be private self-regulatory organizations. And Congress was quite clear about that in the LeBron case as well, and nevertheless, the Supreme Court said that Amtrak should be treated as the government. I'm also not sure... Congress created the funding scheme for Amtrak and its employees. Congress created Amtrak. It was a federally charted, nationally charted private corporation that set that thing up. So your view is that the SEC would have the power to fix the problem with the hearing officers, to do all the steps it takes them to be officers, to give them pay, one that is subject to impeachment. That's all within the SEC's statutory authorization from Congress. I think it is. We'd have to go back and look at the Exchange Act, but I think the SEC would have the authority to do that, given the extent and scope of its regulatory authority over FINRA. Maybe this doesn't matter, and you can explain to me why it doesn't matter, but can FINRA shut its doors, just of its own volition, whether the government... I know you think FINRA is the government, but whether the SEC wants it to or not? I don't think it could, Your Honor, and the reason why is the SEC has the authority, very limited authority, to remove the leadership at FINRA, and one of the narrow circumstances where it can do that is if FINRA's officers are failing to enforce FINRA's rules or the provisions of the Exchange Act that FINRA's tasked with enforcing. And so I think, and Your Honor's hypothetical, if FINRA leadership just said, okay, we're taking our ball and going home, I think at that point the Commission could come in and say, all of the people who are in leadership at FINRA, they're derelict in their obligation to enforce federal law, and so we're going to remove them. Well, if they've shut their doors, they're already gone.  Sorry, I don't mean to stop any questions, but if they decide we're not, we've decided to stop being FINRA, we're all going to go on vacations and spend more time with our families, there's no board of directors. Is the hypothetical we're positing everyone at FINRA quits? I thought that was that FINRA just closed. Yeah, they just disbanded. They just decided to shut their operations. Again, Your Honor, I think the way, what would happen in that scenario is the SEC could come in and say, there's going to be a new set of people. We're going to keep firing whoever's decided to close FINRA until somebody goes in and continues to operate it because of the critical role that this organization plays in enforcing federal law. Really? Wow. Okay. Can I ask if FINRA is unconstitutional for the reasons that you argue in this appeal? Does that mean the Horse Racing Commission is also unconstitutional? It's unconstitutional as applied to an enforcement action, and one thing I'd note is that both the Fifth Circuit's decision and the Sixth Circuit's decision, they reserved this question. The Sixth Circuit expressly reserved the enforcement issue when the Horse Racing Commission would be able to file a civil suit. I read Judge Sutton as reserving more broadly than as applied enforcement situation. I'd also note that that opinion for the Sixth Circuit in Oklahoma, it specifically notes that these issues around enforcement by the Horse Racing Association were not fleshed out in the briefing, and that's the specific thing that we're focused like a laser on in this PI. Who is the individual person in your expedited enforcement proceeding who you think was not appointed properly and is not sufficiently removable? Is it the hearing officer? There are two problems. One is the hearing officer, who is analogous to the ALJs in Wichita, and the other is the board of FINRA, which is analogous to the board members in the PCAOB case. I'd note with respect to the PCAOB, in Free Enterprise Fund, the Supreme Court says that those board members of the PCAOB are inferior officers, and so we think that both the FINRA board and the hearing officer have to be appointed in conformity with the Appointments Clause. What if there were two self-regulating organizations, FINRA and FINRA 2.0? Would you be making all the same arguments? I think I would be making all the same arguments, Your Honor. I think those arguments would not be as strong as they are, but yeah, I do think that at the point at which Congress mandates membership in some organization as a condition of being a participant in an industry, then that transforms the organization into something that has the ability to enforce executive power. And then an argument against that would be, well, you get to pick which organization you're in, so Congress hasn't mandated that you belong to this particular organization. What's your response to that? You know, I think that would be a potential way of distinguishing our case from that one, but I nevertheless think that it would be, you know, particularly if you have a situation where the commission is mandating, regulating heavily entwined with both of the two organizations, which I assume in this hypothetical, that's what we would have. I think in that situation, both of the organizations would be state actors for this purpose. It seems like your argument would have to be the same. I don't understand what the distinction could be. I mean, it's true that your argument gains force because there happens to be, and you may say it's not just happens to be, it's minimizing, but it's the state of the world is there happens to be one, and so expulsion from that one means the end of the business. But every substantive point you're making, it seems like it would have to work in a context in which there were two, three, seven, 10. It would still have to be the case because all Congress is doing is saying that whatever the SROs are, here's the set of rules that govern them, whether there's one, whether there's five, whether there's more, I think would have an all or nothing proposition. I think that's probably right, Your Honor. Let me just emphasize that that's not the principal distinction that I'm drawing with the exchanges here. The reason the exchanges are different is you don't have to be a member of any exchange in order to participate. Right. You have to be a member of some self-regulatory organization. Correct. But if there's 10, then it could be any of the 10. Sorry, I answered the Chief's question. Yes, I did. Okay. And then with the exchanges, you're saying you could refuse to join any exchange and still sell. Correct. You may not have any customers because people may not – you may need the exchange for various reasons, but it's not mandated by law that you belong to one. Exactly right. And so FINRA is more like the bar association than some voluntary organization. You think about an integrated bar, a state with an integrated bar, and if that integrated bar is going to expel someone from their private association, and that just so happens to have the effect of stripping someone of the ability to practice law, then that person is entitled to due process. That's really well established. And for the same reason here – I thought they were usually run by a state court. It depends on the state, Your Honor. So a state bar – in states that have integrated bars where there are states that give significant authority to the bar association to exercise prosecutorial discretion and initiate legal ethics enforcement proceedings and expel someone from the profession, and there's a due process right there. And for the same reason, Alpine's entitled to constitutional due process and the other panoply of constitutional rights in the context of – You haven't argued here that you're not getting due process in the expedited proceeding. That's not before the court. We actually – we don't think that we are getting due process. That's true. And it's also true that the Exchange Act requires fair process in FINRA proceedings. So we don't think that's being provided, but that's not before the court. With regard to the constitutional problems that you've raised in this appeal, would a sufficient remedy by the SEC, by the court, would these two things cover you in terms of being a sufficient remedy? The SEC would appoint the hearing officers and FINRA board, and this court would hold that the statutory provision about for-cause removal restrictions that apply to the hearing officers and the FINRA board are void. I think that would do the trick, Your Honor, and I just note that those are the remedies that the Supreme Court ordered in free enterprise funding with you. FINRA's a privately-charted corporation, maybe? I forget. I think it's a Delaware corporation. Delaware corporation. So its bylaws allow USBC to appoint its board? I assume those bylaws provide how the board is appointed. They do. Their bylaws – You get your board appointed a totally different way. So what happens to the corporation? Yeah, so FINRA would need to change its bylaws, and I just note that when FINRA was – It would have to change itself to a governmental organization. When FINRA was created out of the merger of the NESD and the New York Stock Exchange Enforcement Arm, it changed its bylaws essentially at the direction of the SEC in order to further insulate the board from influence by FINRA's members. And so, yes, there would need to be a change to the provisions of FINRA's – category of employees, the hearing office, in this one form of expedited proceeding. And yet the remedy you seek requires changing the bylaws in terms of incorporation of the entire FINRA entity, including taking a board that is now chosen by its members and have them chosen by the government. Sometimes the term remedies – I feel very amplified. Well, it is as applied, and here's why. The specific remedy that Alpine is seeking is simply an injunction preventing the expedited proceeding from going forward. Sometimes this term remedies is used in two different ways. To decide the decision, we have to understand what your merits argument is and evaluate that. And so, you're saying this is just like – I'm just like peek-a-boo and the Freedom Prize Fund and this is – that's all this is. But it's not like that. Congress didn't create it. They're going to have to – I don't – so I'm failing my corporate law here. I don't need to de-incorporate and then re-incorporate? I don't think they need to de-incorporate and re-incorporate, Your Honor. I think it's a matter of – to fix the constitutional problem with this organization. They have to change. They would need to change. I think that's right. They'd need to change the way they appoint the hearing officers and the federal board members. Why are the board members officers of the United States? It's for the same reason that members of the PCAOB board were, I guess, after the Supreme Court invalidated the – You're just challenging the hearing officers here in an expedited proceeding. You're not even challenging the hearing officers in their general regulatory proceedings. And the board wasn't created by Congress. No government official appoints the board now. And I know you raised it, but I saw virtually no argument in your brief about why the board itself be deemed – be filled with people who should be officers – should be deemed officers of the United States. So I just don't understand what we're doing here. The answer to that question, Your Honor, is the board is ultimately responsible for overseeing the exercise of prosecutorial and investigative discretion. Not the SEC. That's correct. Yeah. And that's the way in which the board is the same as the PCAOB. And so that's the reason that – It's not the same in that PCAOB board was appointed by government officials and created – the whole entity was created by the government. So we just have to put that aside and say that because you have people who make these prosecutorial judgments for a hearing office. So somebody there must have made some decisions about expedited proceeding. The board has to vote to authorize an expedited proceeding. I'm not sure that the board directly authorizes an expedited proceeding. Then why are we replacing them? We're replacing them because they're ultimately – well, again, the remedy we're asking for with respect to our as-applied challenge is just an injunction against this expedited proceeding. But to fix the constitutional problem that we have identified, it's necessary to replace – to appoint the board members in a way that comports with the appointments clause. And the reason why is because those people are exercising significant executive authority in the context of overseeing a core of people who are responsible for making these really significant prosecutorial decisions. And that's – again, in those ways, this case is just like the free enterprise case. And I acknowledge, Your Honor, that there are differences too, and that's the whole reason that we're here. But with respect to the degree of authority that's being exercised, governmental executive power, this organization is not different from the PCAOB. And so the rule of constitutional law should be the same. The board members – what is their exact role in the context of a disciplinary proceeding? So is it just that anybody who supervises – anybody who's in a superior role to the hearing officers necessarily is bound up in it because of the hearing officers themselves are inferior officers? Then is your idea that anybody who supervises them necessarily is too because they're at least in some organizational way in charge of the people who are carrying out the governmental function? Or is it that they have an actual concrete role? You know, what I would focus on less is the board supervision of hearing officers, more the board supervision of the people who are making these prosecutorial decisions. But I do think because they're ultimately legally responsible for the exercise of executive power that happens at that sort of line prosecutor level, just like a U.S. attorney would be, that they're officers of the United States. So it's not just the hearing officers. I thought you were only arguing about the hearing officers. But from what you just said, I assume you're saying whoever it is that does the enforcement core for FINRA, those folks are all going to be implicated too, or at least their supervisors. Their supervisors. Just like a U.S. attorney. That's right. So an assistant U.S. attorney isn't an officer of the United States, and for the same reason you're not going to have every... Right, but they've got a supervisor. They've got to figure out who their supervisor is. You're calling the board the U.S. attorney? Or do you think there's people lower? I don't think there are people that are lower. I think the analogy is between a U.S. attorney and members of the... So it's not like a head of the Office of Enforcement? I suspect that there is, Your Honor, but I don't... The head of the Office of Enforcement would not be like the U.S. attorney? You know, this line of significant executive authority, what counts as significant executive authority under Buckley and the other Appointments Clause cases, it's admittedly a difficult line to police. I'm not sure. We don't know how it works. I mean, if the board's not making the decision, if they're delegated, then they can still be officers for sure, under your theory. Right. But if it's just as, you know, the Attorney General is not making every prosecutorial decision in the United States, it's delegated to U.S. attorneys, and it's because they have that delegated authority that they've been deemed officers. But you're not doing that within FINRA. You're just going for the top and the hearing officers. That's correct, Your Honor. We've only brought challenges to members of FINRA's board and the hearing officers. Are the people prosecuting these disciplinary actions, are they, under your theory, employees of the United States? If their bosses are officers of the United States, are they then employees of the United States? I don't think there is a constitutional category of employees of the United States, so I guess I'm not sure. I'd need to know what an employee of the... what Your Honor means by an employee of the United States. I'm just trying to figure out what their status would be. Are they contractors of the officer? And there's lots of rules about government contracting that would have to kick in. I don't think they'd be. They might not be contractors within the meaning of whatever statutes Congress has with respect to contractors of the United States. I don't know. Figure out how everyone gets to keep working. Yeah, you know, our top line answer to that question of how this organization keeps working is the same way that the FHSA kept working after Collins, the same way that the PCAOB kept working after... It's more complicated here. You've got to admit this is a privately charted corporation without government-appointed boards or government funding, so it's not exactly the same. There's a lot of rules around these types of things within the government, so it's going to be a lot more complicated, which doesn't... It's more of trying to understand the consequences of even a PI, let alone evaluating the merits of your claim. That's why I'm asking the question. Maybe for them, I'll just sort it out. Right, and, you know, in terms of the consequences for a PI, obviously, this court at the missions panel stage entered an injunction-pending appeal. We haven't seen the wheels of FINRA come grinding to a halt, and I think if the court reversed the district court and ordered the entry of the preliminary injunction with respect to the expedited proceedings so that we can move forward with our case without having Alpine closed, there wouldn't be some cascading... I guess I'm not... I mean, I see the appeal of a judgment that is that narrow, and a holding... I mean, the judgment would be that narrow, but I see the appeal of a holding that is just that narrow would apply only to an expedited enforcement proceeding. But if the reasoning for that judgment is that the hearing officer is practically indistinguishable from an ALJ and LICHEA, I'm not sure how the reasoning could be cabined to just expedited enforcement proceedings. I'm not sure that it could be cabined to expedited enforcement proceedings. I think it potentially could be cabined to enforcement proceedings. To enforcement proceedings. Yes, Your Honor. And that may be what the Constitution requires. That's going to be somewhat disruptive, at least until the SEC does... the bylaws are changed and the SEC appoints the hearing officers and board according to the Constitution. It might be... I don't know how long it takes to change the bylaws. I suspect the appointments could be done in an afternoon. So I'm not saying that the whole federal regulatory regime is going to come down, but I do think that it would be hard to issue you a judgment with reasoning so narrow that it only applies to enforcement proceedings. So it only applies to expedited enforcement proceedings. Right. And one thing that may be helpful here, Your Honor, is to look to the district court's opinion in the Kim case that's cited by my friends on the other side. And they... the district court there made reference to the fact that there are currently pending less than two dozen enforcement complaints in front of federal hearing officers. I would just compare that to the fallout of the Supreme Court's decision in Noel Canning. There were hundreds of NLRB decisions that had to be reevaluated as a result of that decision. And so we're not talking about something that's going to be enormously disruptive, but even if we were, the Supreme Court has said over and over and over that the separation of powers is not about administrative convenience. And in some ways, it's at war with administrative convenience. And it's the duty of the courts to honor and enforce these structural provisions of the Constitution because they're provisions that, you know, the framers thought they were so useful, would be so effective at safeguarding liberty that they didn't think a bill of rights was necessary. Can I ask a question about the OLC opinion, the 2007 OLC opinion? So it specifically deals with contractors, but you don't conceive of FINRA as a contractor. I don't conceive of FINRA as a contractor. Does that matter? There is something about a contractor that the government has actually retained somebody and is paying. And the government's not paying FINRA. Well, it goes back to my colloquy with Judge Millett about whether – one way of thinking about the way FINRA is funded is through government fees. I mean, I think that's fair given the role that the Exchange Act and the Commission have charged FINRA with. But that kind of makes – you could analogize those to government fees if you conceive of FINRA as the government. But it seems like there's a tautology problem there, but maybe I'm missing – No, I think you're right, Your Honor. It collapses into the broader – The contract exists regardless of how you conceive of it for constitutional purposes. It is just a fact about the world that the government has retained a private entity to do – or a private person to do something. And I don't know that anything turns on this, but it is of note that the OLC opinion is specifically talking about contractors. And maybe the logic just necessarily applies to this context, too. But I didn't know whether you had a reaction to that. Yeah, I guess one reaction is – I think elsewhere in that OLC opinion, there's a discussion of whether or not receiving some sort of federal emolument is a necessary predicate to being a federal officer. And after this very careful historical analysis, OLC concludes that yes or that's no. Yeah. Okay. All right. Let me make sure there's no further questions for you this time. Okay. Thank you. We're going to go talk to rebuttal. Thank you, Tehrani. May it please the Court, Amir Tehrani for the Financial Industry Regulatory Authority. No court in any jurisdiction has ever held that the Appointments Clause applies to employees of a private corporation. Alpine has not identified any reason for this court to be the first to reach that unprecedented conclusion. So why not? So suppose after Lucia, the SEC decides to avoid the Appointments Clause issue by just turning all the ALJs – they just retain a contractor that has ALJ equivalents to perform the exact same function. Would then the Appointments Clause issue just go away because now the SEC is doing the same function through a private entity rather than through its own ALJs? Yes, Your Honor. If there is a private entity performing delegated federal powers, the Appointments Clause is inapplicable because the Appointments Clause applies to officers of the United States, not to officers of a private company, not to officers of a state government. The meaningful constitutional check there is the private non-delegation doctrine. So if the SEC went that route, there would need to be supervision by the SEC. Those private ALJs would need to function subordinately to the SEC. That's exactly – Do you think the level of accountability in that hypothetical compared to the level of accountability pre-Lucia would be worse or equal or better? I think it will depend on the structure that the SEC put in place in terms of the oversight of the private ALJs determinations. But to the extent that the commission, the SEC itself, has the ability to engage in de novo review of the private ALJs decisions, just as the SEC here has the ability to engage in de novo review of FINRA determinations – Was the SEC's review of ALJ decisions in Lucia and de novo?  And so it sounds like nothing has improved on the accountability front in the Chief's hypothetical, right? In terms of accountability to the president, which was the concern at issue in Lucia, then the SEC commissioners are accountable to the president and are responsible for overseeing the private ALJs that have been hired. I don't understand how they're more accountable as private ALJs than they were before Lucia as government ALJs. They are accountable – So they're equally accountable. They are accountable because the SEC commissioners are accountable to the president. But that wasn't enough accountability for Lucia. It was not sufficient there because we were dealing with public officials, with officers of the United States who were employed by the United States government and who were insulated by two layers of FOC for cause removal objections. So just to make sure that – I think I'm tracking – but the accountability problem identified by the court in Lucia would be solved, according to you, if everything about that regime stayed the same except the ALJs became private instead of public. Yes, because the accountability concern in Lucia was about the accountability of federal officers of the United States to the president. And if the amount of accountability stays the same, then it seems like what was a constitutional problem in Lucia would remain a constitutional problem. No, Your Honor, because the accountability considerations when we're talking about private individuals or employees of a private company are different. They are not officers of the United States. The accountability concerns are dealt with through the private non-delegation doctrine. Do you see how – I mean, it's probably not in your interest to say yes, but do you see how it seems odd to say that something that is a constitutional accountability problem gets solved by putting the unaccountable people even farther away from the president? I don't think it's odd to follow the plain language of the appointments clause, which requires presidential appointment of officers of the United States and ensures that officers of the United States are accountable to the president. You can agree with what you just said and say, if they're government, they have to follow the appointments clause. But you could also then agree with your opposing counsel and say, and if they're private and doing stuff that would otherwise require the appointments clause, that's just per se unconstitutional. In that scenario, the private non-delegation doctrine ensures government oversight and ensures accountability because those private individuals must be subject to oversight and must function subordinately to the federal government. Isn't that same private non-delegation doctrine going to restrict what these ALJs, privately contracted ALJs can do? They would have no subpoena power. It doesn't have to come from the SEC itself. They couldn't possibly issue decisions that would take effect absent review or after a certain amount of time. Nothing could take effect without the SEC actually reviewing it. There could be no sort of default. If you don't seek review, this will become final. I mean, you have to change. And that private non-delegation doctrine would make them, at best, ALJ very light. And they wouldn't be the same as Lucia ALJs. There may be some modifications. Maybe there has to be to satisfy the private non-delegation doctrine. The private non-delegation doctrine requires that those private individuals function subordinately to the FCC. They couldn't have any independent capacity or authority of their own or consequences from their decision-making on their own. They would have to be like fiscal intermediaries in the Medicare and Medicaid context, right? They can do adjudications, but they're just applying sort of simple little rules that are laid out for them, and their decisions have no effect if you choose an appeal, right? And we can't have private people, private entities contracted to make initial decision-making on people's claims about disputes, about money, about benefits, and things like that, right? I see my time has expired. May I answer the question? There would need to be the possibility of review. The respondent in the ALJ proceeding or the respondent in the FINRA disciplinary proceeding might not take advantage of that opportunity for review. But as long as the FCC has the ability to review, has the ability to step in, then that— Not the obligation to review? The obligation to review is not required. It's the opportunity to review. The FCC has the opportunity to step in and review any FINRA disciplinary proceeding, even if the respondent doesn't seek that review. That is the check that the private non-delegation doctrine requires, and it's the check that is found in the Exchange Act. This court itself in NASD versus SEC described the SEC's oversight of the NASD, FINRA's predecessor, as plenary supervision and plenary supervisory powers in the United States versus NASD in 1975. First of all, in the situation we have here, the expedited proceedings, they don't get plenary review when they're expelled. They first have to get review, much more narrow review, through the vision of a stay application. And only if they succeed there are they going to survive long enough to get plenary review. They have the opportunity to seek a stay on an expedited— I understand, but a stay proceeding is not plenary review. Correct. That is the first step. So, and if the SEC says no stay and they've been expelled, they're not going to be alive as a business long enough to come seek SEC plenary review, are they? They could reinstate their business in the event that the SEC ultimately reverses FINRA's determination. Oh, wait, wait, wait. How long does the ordinary, so not the stay motion, but an ordinary SEC plenary review proceeding take? It varies. It can take months. It can take longer, depending on how long the SEC takes to rule. The important point— They do have to completely go out of business. I mean, they can't possibly survive pending plenary review. If they are expelled from FINRA's membership, then they would be violating the Exchange Act if they continue to operate as a broker-dealer during that period. But, Your Honor, the SEC itself has issued a rule requiring that it expedite consideration of stays to the greatest extent possible. In Alpine's 2019 stay application to the SEC, the SEC acted in two days without waiting for a response from FINRA. The application was filed on Friday. Two business days later, on the following Tuesday, the SEC granted the stay. To the extent that the SEC has concerns about the way in which FINRA conducts these expedited proceedings, it has the power to add to, abrogate, and delete from FINRA's rules. It could mandate that in every expedited proceeding there be an automatic stay to provide for SEC review. It could issue a rule that overrides— The other side cited a statute that it says bars the SEC from adopting an across-the-board rule that would grant a stay. Is that different from what you're saying? Maybe I missed the context. So we disagree with Alpine's reading of that statute. It's 15 U.S. Code 78 SD2. And what it says is that application to such appropriate regulatory agency for review shall not operate as a stay of such action unless such appropriate regulatory agency otherwise orders, summarily or after notice, an opportunity for a hearing. And then it goes on to direct the appropriate regulatory agency to establish, for appropriate cases, an expedited procedure for consideration and determination of the question of a stay. Nothing in there would prohibit the SEC to promulgate a rule that provides for an automatic stay in expedited proceedings. Can I ask you, your position, do you acknowledge that it's inconsistent? And that doesn't mean it's wrong, but I'm just wondering, that it's inconsistent with the 2007 OLC opinion? Yes, it is consistent, however, with the 1996 OLC opinion, which came out on the opposite side of the issue and concluded that the appointments clause is limited, as we argue, only to employees of the United States government. So one point that the 2007 OLC opinion made, if I'm remembering the OLC opinion correctly, is that it can't be that the entire Justice Department could be contracted out and that creates no appointments clause issue. But under your view, that it could be. It's just that you would say there's a private non-delegation backstop. But for appointments clause purposes, the Justice Department could be contracted out. Yes, from an appointments clause standpoint, those private individuals exercising DOJ's responsibilities would not be officers of the United States. There could be very serious private non-delegation problems there, but it would not be an appointments clause problem. And there are two textual reasons. In fact, historically, that was how the federal government prosecuted. It didn't have a great big Justice Department, and it would contract out lawyers to prosecute cases. The federal government would do this, and there was no appointments clause issue whatsoever. That's correct. And Lincoln prosecuted cases for the federal government. Are those permanent positions? I don't know the answer to that, Your Honor. You're correct that for the appointments… You've got another job, Abraham Lincoln. But that history is also reflected in the PTAM provisions that the first Congress enacted and that have existed throughout the course of the last two and a half centuries where private individuals have been given the authority to… In the OLC opinion, you're correct, Your Honor, but other courts have rejected appointments clause challenges to the False Claims Act because in their view, officers of the United States must be government officials and PTAM relators are not government officials. The Fifth Circuit on bank in the Riley case rejected an appointments clause challenge to the PTAM provisions of the False Claims Act, and they held that at a minimum, a continuing and formalized relationship of employment with the United States government, unquote, is required for the appointments clause to apply. The Tenth Circuit reached the same conclusion in the Rockwell case. There's a second textual reason that the appointments clause doesn't apply to FINRA's board members and hearing officers, and that is they do not hold offices established by law within the meaning of the appointments clause. They hold offices established by privately promulgated rules, and whatever the framers had in mind when they used the term established by law, they certainly weren't thinking about privately promulgated self-regulatory organization rules. FINRA's rules do operate as federal law, correct? They do once they are approved by the FCC, Your Honor. But established by law within the meaning of the appointments clause is best read as requiring a federal statute, and that's clear from the other use of bylaw five words later in the appointments clause, which goes on to state that Congress may by law vest the appointment of inferior officers in one of three entities. The use of bylaw there clearly refers to a federal statute. You don't think regulations would cover it? I don't think that's consistent with the plain language of the appointments clause. However, it's not necessary for this court to reach that issue here today because SRO rules are not regulations. They are privately promulgated rules. You mean law is limited to statutes? Correct. There have been at least some decisions that think a law applies to regulations. What was the Chief Justice Marshall opinion? Is that a regulation? There are recent circuit court opinions that have wrestled with this issue. As I understand it, it's an open question whether bylaw can extend beyond federal statutes. I think there's a very strong textual argument that it is limited to federal statutes. However, even if it extends to regulations, it would not apply to a privately promulgated SRO. Can you let us know, since you represent FINRA, if we get to the remedy stage, I know that you resist that, but if we get to the remedy stage, can you talk about what it would entail for FINRA to come into compliance with the requirement that the officers are validly appointed under the appointments clause? It would require congressional action because Alpine's position is that FINRA's board members and hearing officers are inferior officers. The appointment of inferior officers rests with the president unless Congress, by law, vests the appointment of such inferior officers in a head of department such as the SEC. Either there would need to be congressional action authorizing the president to nominate and, with the advice and consent of the Senate, appoint FINRA hearing officers and board members, or Congress would need to vest that authority in the SEC or another head of department. Until that happened, FINRA would not be able to operate. How was the SEC able to appoint the ALJs after Lucia absent congressional intervention? They are federal employees, Your Honor, and the statutory framework governing the SEC's authority over its own employees is different from the SEC's authority over private employees and employees of FINRA in particular. No statutory authority to appoint your board, right? Correct. And as of now, no statutory authority to appoint your hearing officers? Correct. Or to appoint anybody within FINRA? That's my understanding, Your Honor. Unless Congress were to act, FINRA would be incapacitated and unable to discharge its regulatory responsibilities under the Exchange Act. There was some discussion earlier about whether FINRA merely expels you from a membership organization or whether it bars you from the entire industry. And maybe your answer is those are the same things. FINRA's website says that FINRA's sanctions include bars from the brokerage industry. Do you agree with FINRA's website statement? FINRA can expel a member from its own membership. That's not my question. The consequence of the fact that there is a single National Securities Association is that a member who is expelled who continues to engage in broker-dealer activities would be violating federal law. But if we wrote in our opinion FINRA can bar Alpine from the brokerage industry, would that be an accurate statement or an inaccurate statement? I think effectively bar would be the more accurate statement. And if that expelled member continued to practice, then FINRA would have no jurisdiction over that expelled member. There would be no steps that FINRA itself could take at that point to remedy the violation of federal law. And it would be up to the SEC to step in because that expelled member was violating federal law by continuing to operate as a broker-dealer. Can I ask if you agree with this statement? I suspect you're going to not agree with it. Significant executive power is exercised at least when someone enforces federal law, coerces private conduct, and does it nationwide with discretion in a continuous office empowered by federal law. I don't disagree that that's an accurate statement of significant executive authority, but that does not make one an officer of the United States. That leads to my next question. Do you believe that describes what FINRA hearing officers do? I agree they exercise the same powers as SEC ALJs, which in Lucia were found to exercise significant authority pursuant to the laws of the United States. Of course, SEC ALJs are employees of the federal government. I think where we part ways is do you agree or disagree with the statement? Significant executive power cannot be exercised by private citizens at all. I disagree with that statement. Because the private non-delegation doctrine doesn't support that statement according to you? Because the private non-delegation doctrine is not an across-the-board bar on the delegation of significant executive authority to private individuals. As long as they are operating subordinately to a federal official or a federal agency, their authorities comport with the private non-delegation doctrine. The significant authority test is not the be-all and end-all of the Appointments Clause. The Supreme Court made that clear in the Aurelius case. Why are you even agreeing that it's significant authority, though? Because the whole point of private non-delegation is that, in fact, the agency is riding herd. Any significant authority is exercised by the agency. The agency is just subordinate to the agency and cannot make its own sort of freewheeling significant decisions. I am conceding that FINRA hearing officers exercise the same... They don't. Do they have subpoena power? They do not have subpoena power. That's not the same. I won't dispute that. Can their decisions have legal consequence without SEC? If someone's challenging it, obviously someone can say, that's fine, I don't want to deal with it anymore. They can do that federal or otherwise. If someone challenges it, will it have effect without the SEC signing off and owning that decision? If it is challenged, if the decision is challenged, then the SEC undertakes plenary review. If someone chooses not to challenge it, then the one exercising the authority there is the individual choosing not to challenge. I think that's a fair characterization. My only point is that... Well, it's important. I'm confused between your brief and what I'm hearing you say here. You seem to say, yeah, we're exercising, we're exactly like those ALJs, when you aren't. All I'm saying is... You have much more superintendents. We are materially different from SEC ALJs because we are private individuals and there are material differences between FINRA's enforcement powers and the SEC's. To clarify, my only point is that in Lucia, the Supreme Court identified four powers that SEC ALJs exercise. Those four powers involve conducting hearings, hearing witnesses, enforcing discovery orders. Those four powers are also exercised by FINRA hearing officers. How do they enforce discovery orders? Because they can sanction a respondent who fails to comply with a discovery order. For example, an inference, an adverse inference in the hearing. But those powers, as you rightly suggest, Your Honor, do not make FINRA hearing officers officers of the United States, whether those powers are described as significant or not. I think the adjective is relevant here. With respect... Significant independent authority? If this court were to hold that FINRA hearing officers exercise significant executive authority, my answer would be the same, that they are not officers of the United States. However, there are important material distinctions between FINRA's powers and SEC ALJ's powers. In addition to, of course, the fact that FINRA hearing officers are private individuals, FINRA hearing officers cannot issue decisions that can be enforced in court. FINRA cannot bring proceedings in court to collect fines that FINRA hearing officers impose. FINRA hearing officers cannot issue subpoenas. So those are material distinctions between the enforcement authorities of FINRA and its hearing officers on the one hand, and the SEC and its ALJs on the other. However, if the court were to conclude that these powers constitute significant executive authority, that would not make hearing officers officers of the United States because they are not federal employees. They are not holding an office established by law. And as the Supreme Court itself made clear in the Aurelius test, significant executive authority is not the be-all and end-all of the Appointments Clause. There, there was no question that the members of the Puerto Rico Oversight Board exercised significant authority pursuant to the laws of the United States. They could override Puerto Rico's budget, they could override Puerto Rico's laws, and they could file for bankruptcy on behalf of Puerto Rico. But they were not officers of the United States because their powers were territorially focused. So they were officers of a territorial government, notwithstanding the fact that they were exercising these vast powers pursuant to a federal statute and exercising Congress's sovereign oversight over Puerto Rico. My only point, Your Honor, is number one, to agree with you that there are meaningful material distinctions between the powers of SEC, ALJs, and FINRA hearing officers. But also to make clear that if the court were to find significant executive authority, that in no way makes FINRA hearing officers officers of the United States. I'm sure my colleagues don't have additional questions for you. You do. This is maybe sort of a – imagine that you are the president and you happen to take interest in FINRA's enforcement proceedings, and you're paraphrasing what FDR told Humphreys. And you say to a FINRA hearing officer something along the lines of, I do not feel that your mind and my mind go along together. And frankly, I think it's best for the people of this country that I should have confidence. What could the president do? What would be in his power to fix that problem, what he thinks is the problem? The president could direct the SEC or request that the SEC promulgate rules removing that hearing officer. The SEC has the authority to add to FINRA's rules, to abrogate its rules, and to delete from those rules. One of those rules could be an SEC rule that directs the removal of a hearing officer who is not discharging his responsibilities in accordance with law. That's a forecause. But in my hypothetical, the president isn't saying that you're violating any regulations. The president is not saying to the hearing officer you're violating any laws. The president just says, you have discretion, and I don't like how you're exercising that discretion. As long as that rule is consistent with the Exchange Act. So as long as it furthers the public interest, which is the ultimate guardrail on the SEC's rulemaking authority under the Exchange Act, the SEC could promulgate a rule to remove that hearing officer because in its view, it's not in the public interest for that officer to remain in place. So the SEC could not just fire that officer, but the SEC could promulgate a rule that would remove that officer. And of course, the president would have to get the SEC to do it, even though the SEC is itself not removable at will. Correct. But that one level of protection for the SEC's commissioners has been upheld by the Supreme Court in Humphreys. So there's no problem with that one layer. Excuse me. That would equally be true of an ALJ. That was appointed consistently with the Chief. Correct. An SEC ALJ is not subject to any protections from removal. PCAOB, I think probably the president could have convinced the SEC, the agency could have convinced the SEC to promulgate a rule that would have removed the PCAOB member that the president was dissatisfied. And I think that takes us back to where your questioning started, Your Honor, which is the distinction between accountability in the public and private settings. And in the public setting, when we're talking about federal officers and employees, two layers of for-cause removal protection is not sufficient accountability for the president. But when we're dealing with private employees and private individuals, then the non-delegations accountability standards are different. What's your best precedent that says that in the removal appointment context? There aren't, as far as I'm aware, non-delegation cases that speak directly to this hypothetical. However, there are multiple private non-delegation cases rejecting challenges to the NASD decisions from the Second Circuit, the Third Circuit, the Ninth Circuit, as well as the recent Fifth and Sixth Circuit decisions in the HISA context that have pointed to the FINRA-SEC relationship as the gold standard for the relationship between the federal government and private entities. Your opposing counsel said that, especially in the judge's own opinion out of the Sixth Circuit, that he reserved the type of appointment removal questions that we're considering here. Do you agree with that? He reserved the fact that that case was not an as-applied challenge to a specific enforcement proceeding. But importantly, he did underscore the extent to which the FTC exercised plenary oversight over HISA's enforcement powers through its control of the authorities' rules. So the FTC, just like the SEC here, can abrogate, add to, and modify HISA rules, which the Sixth Circuit, in Judge Sutton's opinion, pointed to as comprehensive oversight of HISA's enforcement powers. And that may be their next appeal about FINRA rulemaking, but I think this one is not about that. This appeal is on appeal from a preliminary injunction denial, but their complaint is far broader. Their complaint makes clear that this is an existential challenge to FINRA. And in fact, they state at paragraph 138, appendix 33, FINRA's very existence and its exercise of unbridled and unchecked powers violates the Constitution. So this court's reasoning in deciding this preliminary injunction issue is going to inform the district court's consideration of that far broader question on remand. It's going to inform courts' consideration of challenges to dozens of securities exchanges, to clearing agencies, to HISA. Alpine itself has brought a copycat, identical suit challenging the constitutionality of a clearing agency, SRO, in the District of Utah, raising the exact same challenges, which underscores the fact that the issues before this court are not limited to a single expedited proceeding. They really call into question the constitutionality of the entire self-regulatory model that has functioned so well for the past 200 years. Thank you, counsel. Make sure colleagues don't have additional questions. Thank you. Good morning, and may it please the court. Joseph Busa on behalf of the United States. Chief Judge Srinivasan, if you agree with Chief Judge Sutton's opinion in the Oklahoma case on private non-delegation grounds, that concludes all the analysis you would need to do to uphold what is going on in this case. Private non-delegation is a doctrine that's been around for nearly 100 years. It is the Supreme Court's chosen method for analyzing when private entities can be asked to help a federal agency administer a federal statute. The standards announced in Adkins are well understood. They have been applied many times to FINRA's predecessors, and that relationship has been frequently upheld. The appointment and removal requirements of Article II govern the internal structure of the federal government, and they have no application to a private corporation's private officers. There was a lot of discussion at the outset this morning about compelled membership, and I want to just clear up a misunderstanding. Why not? Why don't they? That is your position, that private non-delegation does all the work, but is there not an accountability overlay that's embodied by the appointments clause and the removal power that is in addition to what private non-delegation deals with? I think both doctrines deal with accountability, but the test for whether someone is an officer of the United States is what would maximize the accountability here? The accountability that is addressed by the private non-delegation doctrine is democratic accountability in the government. The government's got to be in control. If that test is met, then there is no constitutional problem with a private individual functioning subordinately to the agency. Within the federal government, additional requirements apply from the appointments clause to give the president an added degree of control over the government, because after all, Article II is the president's domain. But the Supreme Court's been very clear. If you want to analyze when a private entity can be asked to play a role subordinate to an agency, you apply the Adkins Principles. That's what all of the courts of appeals have done in consistently upholding this relationship. Turning to compelled membership, I want to clear up an important misunderstanding, because I think this is pretty important. FINRA does not issue an order expelling anyone from an industry or requiring them not to do anything within an industry. Congress made a decision requiring membership in an SRO, but actually, importantly, it gave the SEC the ultimate power to decide whether to require SRO membership. This is 15 U.S.C. 780B9. FINRA should change its website. The website says our sanctions include bars from the brokerage industry. Sounds like a misstatement of what the statute clearly says, Your Honor. And again, the constitutionality of this system, it turns in no way on what a web administrator has chosen to put up on a website. Today, their very able counsel said that the statement, as long as you add the words in effect, is correct, which I think is definitely correct. No, Your Honor. I urge you to take a look at 780… You're not only disagreeing with the appellant here, but you're also disagreeing with FINRA about what FINRA has the power to do. I think they've just made a slight misstatement. It is true that… Put the website aside. You're disagreeing with FINRA's representation today that they have the power to bar Alpine from the brokerage industry. Yeah, absolutely. Please take a look at 780B9, which says that the SEC, by rule or order, can remove that membership requirement in order to participate as a broker in this industry. So, no, it is not a power that FINRA has to decide whether someone's a member of this industry or not. Like any other private organization, FINRA can decide who is a member of FINRA. SEC has plenary review authority over that decision, and moreover, the statute squarely gives the SEC the power to decide whether the membership will be required as a condition of participation in the industry. That is not a power given to FINRA in any respect under the statute. Do you know of any precedents that we would be in conflict with their holding if we said this? It's very similar to, hopefully identical to what I said to FINRA. When federal laws have a coercive effect on private conduct, only an officer of the U.S. can exercise significant executive authority by enforcing those federal laws, at least so long as the office is continuous, empowered by federal law, and exercises enforcement discretion. What precedent would that be in conflict with, if any? Addressing that statement directly, I'm not aware of a court saying, no, that's wrong, or yes, that's right. What I would say is you've got, there's no reason to start from first principles. You've got two clear lines of doctrine. All you have to do is apply them to this case. The first is Adkins, and we think we exceed that Adkins threshold. This is the paradigmatic example of a statute in which a private entity functions subordinately to the government. And I think it's important to think about the history here, Your Honor. In 1934, Congress took a pre-existing system, a privately ordered system of self-regulation, and it grafted SEC control onto it to ensure that the private self-regulator was doing a good job that also protected the public interest. In doing so, it gave the SEC sufficient power to supervise FINRA's self-regulatory activities. That structure has existed in that form since 1934. It predates Adkins, and it has never been called into question by any court of appeals since Adkins. We think Chief Judge Sutton got that conclusion right. And then you just have to look at LeBron, Amtrak 2015, Free Enterprise Fund, and Aurelius, all of which make clear that the Appointments Clause applies within the domain of Article II, the structure of the federal government. And the other side has made no claim that FINRA is part of the federal government under those precedents. That's exactly right. FINRA was privately established. Even under your approach, maybe I'm misunderstanding, but even under your approach, could you not have a scenario in which there's no private non-delegation problem, but there's still an Appointments Clause problem because a private entity satisfies the LeBron test? I'm sorry, Ron, I'm going to have to ask you to repeat the question. Okay, so, and it may be that I'm just off on the... I'm sure it's my problem. But no, don't be sure about that at all. Under your approach, you say the way we decide whether the Appointments Clause applies is we apply the LeBron test to determine whether the private entity is the government, right?  Yeah, and so I guess what I'm asking is, even under that approach, could you have a scenario in which there's no private non-delegation problem because there's sufficient supervisory authority exerted by a quintessential executive agency, but the entity still meets the LeBron test so that it qualifies as a government entity, and therefore the Appointments Clause kicks in? I think so with the following qualification. If you're part of the government, then the private non-delegation doctrine will just never apply to you. That's the holding of Amtrak 2015. And Amtrak 2015 highlights how this is a bifurcated analysis. This court, it turns out mistakenly, not your own fault, thought that Amtrak was a private entity, applied the private non-delegation doctrine. The Supreme Court says, no, that's wrong. Applying LeBron, you're part of the government. So private non-delegation doesn't apply, but because you're part of the government, Appointments Clause does apply with remand for consideration of the Appointments Clause. And is that approach, it could be inconsistent with the OLC opinion, and you could have, but I just want to let you tell us whether the 2007 OLC opinion is inconsistent with the arguments that you're making. It's not, Your Honor, for the following reason. I mean, first of all, the OLC opinion, as you noted, is focused on a different question. It's focused on, do you have to be sort of on the payroll in sort of a formal manner in order to be an officer of the United States? The answer to that is no. And so it wasn't addressing this question about the private non-delegation doctrine and using private entities to help an agency, never addressed that once. And then on page 121 to 122, the OLC opinion actually cites LeBron as favorably as drawing the line, a substantive line, not a matter of labels, a substantive line about, are you really part of the government or are you really not? And then the last thing I'll say is that that 2007 OLC opinion comes before Free Enterprise Fund, Amtrak 2015, and Aurelius. So obviously it had no opportunity to consider that body of work that the Supreme Court has now handed down that mandates this bifurcated approach. If you're dealing with a private entity that is not part of the government, the longstanding doctrine you apply is the private non-delegation doctrine. Chief Judge Sutton got that analysis completely right, and we think that settles this case. Do you have the same answer as Fenra on whether contracting out the ALJ function that was at issue in Lucia would eliminate any Appointments Clause problem? Josh, I mean, I think there's a strong distinction you can draw between that hypothetical or any hypothetical in this case. Nothing's being contracted out here. There was a pre-existing system of private ordering, and Congress said, we need to make sure it works for the public interest, and it imposed SEC control on that system of private ordering. Now, we think that that system well survives the applicable scrutiny under Adkins. The other side doesn't even really suggest otherwise. I mean, it's not really their argument. Their argument seems to be there is some heretofore unidentified private non-delegation component of the Appointments Clause. There is no case standing for that proposition. The Appointments Clause, it is clear, applies to the structure of the federal government. You have to be part of the government for those rules to apply. It's a different doctrine that deals with democratic accountability. It does so adequately, and those requirements are well met here. And so then there may be a distinction between the hypo in this case, but under the hypo, do you think that there's no Appointments Clause issue? I haven't adequately answered that, Your Honor, and I would hesitate to just sort of shoot from the hip. I would want to speak intelligently. I do think there is a clear distinction here because of the history and tradition and the pre-existing self-regulatory nature of what's going on here. Congress thought very hard about what to do with that pre-existing structure in 1934 when it was trying to think through what's the SEC going to do, what's this all going to look like. It could have started right from the beginning with bringing everything in-house. The SEC is just going to do everything itself. But it identified very good reasons to allow people within the industry to develop industry standards and ethical standards that, frankly, Congress doubted a government agency would be as good at developing. Congress has revisited that decision multiple times. In 1963, there's a massive SEC-led study, I believe in Congress's direction, looking at the history of supervised self-regulation and concluding we want to keep with this model. Again in 1975, again in 1983, and the SEC has thought about this issue too. There's the SEC concepts release that we cite in our brief discussing the history of self-regulation in this industry, discussing all the benefits that it brings to the public to have the SEC closely supervise these kinds of activities, and again concludes that this is the best way of protecting the public in this area. Let's get some clarification on how the SEC reviews FINRA credibility determinations. My impression is that FINRA's credibility determinations can be overcome only when there is substantial evidence for doing so. Is that right? I have seen an SEC order that says that. I would importantly note the statute doesn't require that outcome, so if you think that's a problem, it's not something that the statute requires. Moreover, I haven't heard my friends on the other side say one thing about any credibility determination problem about the nature of the SEC's review here. As I heard him describe the case today, this is really about the existence of an expedited proceeding, and they just really don't want to have to ask for a stay. I guess that's sort of the crux of why they think they need a preliminary injunction. I just want to highlight… It's a stay proceeding, the plenary review that's required by the private non-delegation document. Right, so the plenary review, of course, comes down the road. The stay provision gives the SEC the full power to decide for itself whether to maintain the SACS quo while it engages in that plenary review. Everyone knows what's going to happen if we deny a stay. We're not going to be around to obtain a plenary review. And so if the SEC has the discretion at the stay stage to effectively say, we don't think you deserve the plenary review given whatever findings were made by FINRA. That's a decision made by the SEC, and by the way… It's a decision by the SEC. Yeah, it's a decision by the SEC. Well, I want to be clear. It's plenary review of the question of whether the status quo will be maintained during the SEC's review. As to that… No, I can't blink reality here. It's plenary review of whether this company will exist or not. So two important nuances there, Your Honor. It's actually a review of whether they'll be expelled from FINRA membership, which is different from whether the requirement to maintain SRO membership in an SRO would be applied in the future. I would agree, but as of now, there's nowhere else for them to go. I agree, but I don't think any constitutional significance flows from that fact. I heard my friend on the other side agree to that. Secondly, I think actually they could join an exchange if they really wanted to and participate in that segment of the industry, and none of this is different from the history. Before 1934, if you wanted to transact on the New York Stock Exchange, our understanding is that you would have to be a member of that exchange, and if they expelled you from membership, you could not do business in that segment of the industry. You could still sell securities. You just couldn't sell it on the New York Stock Exchange. Right, in that segment of the industry. And equally, if they wanted to apply for membership in any stock exchange, they'd be free to do so. And if they were able to do that, they could transact in that segment of the industry is my understanding. And moreover, again, the statute says, as a general matter, we're going to presume that you have to be a member of an SRO in order to participate, in order to transact in securities. But in the very next section, 780E9, it says, oh, but the SEC is actually in charge of whether to require membership in an SRO, and it can order otherwise. As to the question— On an individual basis? I believe it's on an individual or classified basis. They couldn't decide categorically that you don't have—with the statute out there— Actually, the statute provides they can do it on a classified basis, Your Honor. I believe that's the specific text of the statute I'm referring to. But all this just goes to show— I don't know, frankly, but I think the key point is that it all goes to show that the statute is very clear about a hierarchical relationship here. The private organization is a private organization just as Congress found it in 1934 or 1938, depending on which organization we're talking about. The SEC is in charge. It is able to review and set aside any sanction order, and it's up to the SEC to decide whether to allow the sanction order to go into effect pending that review. That's the kind of control that Adkins requires. I've never seen a case to the contrary on that point, and moreover— It's called a plenary review, and it's hard to think of a state application as plenary review. I think it has to be plenary as to what, right? So they've had to narrow what's at issue to just the question of the state. But, of course, that's entirely within SEC's control, right? But SEC has power over that and over the broader question of the merits of, you know, were the facts as FINRA says they are, do those make out a violation? The SEC changes rules and says, you know what? We want to be like Supreme Court. We want to pick and choose which cases we take. Our resources are limited. We have a lot on our plates. So to have full SEC review, you're going to have to file a petition for full SEC review. And we will decide that question. The SEC will decide whether you get full SEC review. So there will be a full exercise of SEC authority as to that question. But if they decide in their discretion not to grant full review, plenary review, you're out of luck. Could they do that? And if they could—so I'm assuming they could have regulations pass something like that. But would it—oh, tell me if it's contrary to the statute or whether it would be insufficient under the private non-delegation statute. I want to be careful. I have not considered that specific hypothetical. My understanding is that the statute says that FINRA has to notify SEC of a sanction and then the SEC reviews that sanction order. I don't think there's language in there about a screening, a cert type screening process. And I'm unaware of SEC contemplating that in the past. Now, I'm not going to rule out—I just hadn't— Assuming—so first of all, you read the statute as saying that they couldn't do sort of a quick review. Is there anything here as like my certification review? Is there anything here that really warrants further review? You don't think they could do that? No, I'm not ruling that out, Your Honor. I'm just saying it's a surprising hypothetical because I've never thought of it in that way. But I'm not going to unilaterally just give that up. Assume they could do it as a matter of statutory. Would it be consistent with the plenary review required by the private non-delegation doctrine? So I think the answer is yes. The private non-delegation doctrine requires that the private entity function subordinately to the public entity. Judge Sutton explained in the Oklahoma opinion that actually the agency is making choices all the time, including choices not to do something, and that those are just as much informed choices of an agency not to change what's going on below as a choice to change what's going on below. That seems rather dangerous as a private non-delegation theory. They get to decide not to step in, and so they could decide not to step in in broad categories of interactions. I'm not saying— Well, if a decision not to act is as much an agency action as a decision to act, I get the theory, then it seems like they would be able to empty themselves of a lot of the burdens that I thought the private non-delegation doctrine imposed. So we have no quarrel with the notion that the private non-delegation doctrine requires that the private entity function subordinately to the agency and that the agency be the final word and have all the power it needs in order to do so. But are they subordinate if the SEC is taking a quick peek and saying, go ahead? I'm sorry? If the SEC takes a quick peek at what they did and then says, are they subordinate? I mean, a quick peek. I'm trying to imagine what that looks like. These are officers of the United States sitting on a commission, and they're presumed to be acting consistently with their understood duties. It's not at all clear that the statute wouldn't let them have a cert petition type review. I don't think anyone thinks that a cert petition is a quick peek, Your Honor. It's not. It involves a great deal of effort on the part of the litigants and the person sitting in judgment on it. But I want to come back to what's actually going on here. No doubt the lawyers would spend a lot of time on a cert petition. That is not helpful in the private non-delegation doctrine. That SEC has to be right and heard. And you can't have accountability unless SEC is owning the decisions and their consequences. The statute says here that the SEC is in charge of whether there's going to be a stay pending the SEC's decision. And its denial of that would be reviewable in this court. In fact, Alpine has sought review of just such a denial, is my understanding. So I don't understand the theory by which there's inadequate public power over what's going on here. First, the private non-delegation can include the fact that you get judicial review. The Fifth Circuit said as much when it comes to eminent domain. The Fifth Circuit said so when it comes to eminent domain. I had thought the entity that had to ride herd was an executive branch agency. Now, I think the key point, your honor, as I keep coming back to the key point is that the SEC is holding the cards here. It can decide to issue the stay. It has done that for Alpine in the very recent past. It can decide not to issue a stay. Either one is a decision of officers of the United States regarding an important matter to Alpine. But they're holding the cards, and that is what the Adkins Doctrine requires. I'm not aware of any case saying otherwise. No further questions from my colleagues? Thank you, your honor. Thank you. Mr. Barnes, we'll give you three minutes for rebuttal. Thank you, your honor. Just a few quick points in rebuttal. My friends on the other side don't have an answer to the loophole concern expressed in Judge Walker's concurring opinion at the motions panel stage. They just don't have an answer. It doesn't make sense for the Constitution to require less accountability when someone's exercising executive power outside of the government than the degree of accountability that's required when somebody exercises executive authority within the government. I think it's also evident from the colloquies with my friends on the other side that they don't have a limiting principle to the rule of constitutional law that they would have the court adopt. Under the approach that the defendants would have the court take, the Congress could privatize a huge amount of federal enforcement authority, and there wouldn't be any constitutional problem with that. Counsel for the United States referenced the history of these SROs, but history here begins in 1983 when Congress mandated membership in this industry or membership in FINRA as a condition of participating in the industry. There was reference to officers of the United States and what that phrase of the United States is doing in the Appointments Clause, and the answer comes from Justice Breyer's opinion for the court in Aurelius, where he says the meaning of that phrase of the United States is it's to distinguish Article I, Article II, Article III of the United States authority from Article IV local authority. The board at issue in Aurelius was exercising local authority, not Article II executive power like we have with FINRA. There was a discussion of the established by law phrase in the Appointments Clause. Chief Judge Srinivasan, you made reference to the great Chief Justice's opinion in Maurice, and what Chief Justice Marshall said in Maurice is that if a position is not established by law, then it can't be vested under the Appointments Clause with significant executive authority with the kind of meaningful power that we see vested in FINRA. So this is an issue that goes our way. If anything, it's another reason to think that there's a problem here to the extent that the court is persuaded that there's not a position that's been established by law here. That's a further reason why these people can't exercise significant executive authority. There was also some discussion particularly— Significant federal authority is the problem just that the SEC is not superintending enough? Is that the issue? It's giving them too much free reign? If the more SEC sits on them, then by definition, the less authority, any independent authority they have. I think that's true, Your Honor. I also think the SEC had supervisory authority over the ALJs and Lucia, and nevertheless, that was— What would the SEC have to do here to— I think it's in the nature of a hearing officer's position that they are an officer of the United States under Lucia. But what if—I mean, so FINRA is also a private—I mean, it is a private organization. So if it wanted to have the ability, as it has for—as it had for two centuries to—or I don't know what it was, at least a century or a century and a half, as it did for a very long time, to admit members, set rules for members, but it's not an SEC rule. But it's own rules for members, and kick them out when they don't comply. FINRA can do that without any of the appointment clause or non-delegation consequences you are raising here, correct? I don't think FINRA can do that by dint of the fact that it is the exclusive gatekeeper for participating in this industry. So I think just by virtue of having been vested with the ability to decide whether it's going to be legal under federal law for someone to be a broker dealer, FINRA, when it makes these membership decisions, when it enforces its own rules, it's enforcing federal law. That's an exercise of executive prosecutorial power. Well, it's not making those decisions in that way. I mean, the consequences of them saying, get out of our organization, are something that Congress has established. But surely, as a private entity, they still have the authority to say who is in our organization and who has to get out. The consequences of that, Congress can speak to. If they kick enough people out and you don't like it, you don't start your own regulatory organization. Your Honor, I think that begs the question. I mean, ultimately— I'm trying to understand the history here. This is a privately chartered, incorporated entity here of a type that's been around for a very long time. And I'm talking about just enforcement of their own rules as to we don't want somebody in. And— So they find out one of their members is a murderer. Okay? There's no SEC rule against that. They just say, we don't want you in our organization. We're here to create public trust. None of us wants to be around you. We're scared to death. Get out. They can't do that? They can, but when they do it, they're exercising executive power. And so that brings us within the scope of— Because Congress passed a law that there's a consequence to not— You can go try and find another one. If you can't find another one to join, that's on you. I don't know who's going to let you in. But you can go try and find another SRO. But get out of ours. As Your Honor knows, there is no other SRO. And so the consequence— Whose choice is that, that there's no other SROs? I guess the Securities and Exchange Commission's choice. No? Has anyone applied? Has anyone gotten together and created something to apply? That just seems like sort of market choice has been made. I don't know. Have others applied and been rejected by SEC? I don't know the answer to that, Your Honor. Okay. So then it's not the SEC's decision as far as you know. Well, but the SEC— I mean, we do know from the history of this organization, the SEC has its fingerprints all over the way FINRA is organized. And the provisions of FINRA rules that lay out the organizational structure for this organization have to be approved by the SEC. And the SEC over time has taken steps to ensure that the organization would be less represented. Well, you said you wanted more SEC control. The problem here was that they're too independent. That is the problem, Your Honor. But then you can't complain about— It's odd that you didn't keep complaining about SEC having all this supervision over it. You want more. I mean, I think you want the SEC to run—supervise more closely the hearing officers. This is a way in which the historical SRO is different from the model that we have today. You go back to the founding of the New York Stock Exchange. That was a genuinely self-run organization. The SEC has stepped in and created an organizational architecture at FINRA that erodes the degree of member influence over the way this organization operates generally, but in particular with respect to the enforcement decisions that the organization makes. And so that's a big difference. One difference—1983 versus pre-1983 difference seems to me the difference between this. Major League Baseball can decide who gets to play Major League Baseball. But then in 1983, Congress comes in and says, if you're not in Major League Baseball, you can't play baseball at all. Is that somewhat analogous? That is exactly what happened. Let me ask this about the remedy then. The immediate remedy for the purpose of this panel, if we agree with you about you meeting the four factors, I think would be a remedy no more, no less than the injunction that the proceedings are enjoined. But once you play out all the litigation and there's an adjudication on the merits and there's ultimately a remedy where maybe somebody else brings a suit and they seek a remedy, we talked about one possible kind of cocktail of remedies, which would be changing bylaws, appointing by the SEC, and the court holds the cause removal provision void. Would an equally effective remedy for fixing what you have identified as a constitutional problem simply be a court holding void requirement that brokers join FINRA? I think that would be an equally effective remedy. That would be much more disruptive. But on the other hand, it would be a much cleaner and judicially, I guess you would say, redressable, manageable, whatever remedy. I don't disagree with that, Your Honor. Why on earth would that be a remedy to the problem? You'd still have FINRA having members and making decisions about them, applying SEC law and saying you are expelled for doing X, Y, and Z and no doubt having out in the market serious economic consequences for them. And we're not complaining about serious economic consequences. We're complaining about the legal consequences. I thought you were complaining about a very serious economic consequence. Well, that is true, Your Honor, but it's an economic consequence. Under this mandatory provision, if the real world economic consequence of getting kicked out of FINRA remained the same, nobody wants to hire you as their broker dealer. Would your position be different? Would the legal argument I'm making be different? Would you still say that's fine, FINRA can do these adjudications just the way they are, the SEC can let them do it just the way it is, they can apply all this SEC law and it can kick people out in a way that has a consequence that everybody in the real world knows means you are what you have called in your briefs the death penalty for that business? I think that's a very different case. It's exactly this one. The only thing is that there isn't something that says, well, you have to be a member as a matter of law, but you do have to be a member as a matter of reality and everybody knows it. But you still think that's enough? I still think that's enough, and I point out, Your Honor, that before 1983… So then the real world economic consequences of being kicked out by FINRA are not something that we should pay any attention to? I think they are… No, you just said they don't matter for your position. I didn't say that, Your Honor, respectfully. Just that that's why it's different. Well, I think 1983 is a critical turning point, obviously. Is that when you think they stopped being self-regulatory? You know, it's a series of things that have happened, but I think 1983 is the breaking point at which once membership in this organization becomes the only way that you can practice this trade… And to be clear, the membership is in a self-regulatory organization. There's not a statute that says membership in FINRA. The statute says you have to be a member of a securities regulatory association, I think is the phrase, but there's only one, right? And so the effect of the law is to put FINRA in this position where they're able to decide whether you can practice your trade. No, it's whether you can be a member of the organization. What lets you not practice the trade is the real world economic consequences, because there isn't another place for you to go, and no one's going to hire you. So I'm a little confused about your answer. I would have thought you still would have been worried, because unless you're in a world where there's a thriving market of people who are not members of the self-regulatory organization, you're going to be in the exact same boat. Right, and to be clear, before 1983, there was such a world. Right, and that's the difference that 1983 makes. Thank you. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan, Millett, Walker